May it please the Court, Davina Chen on behalf of Gerald Mark Williams. Mr. Williams' eight-year period of supervised release commenced in 1997. It should have expired in 2005. Nevertheless, the District Court purported to revoke his supervised release six years later in 2011 based on a 2011 conviction. The Court held that it still had jurisdiction in 2011 because it found that there were two separate periods in which Mr. Williams was a fugitive and therefore his supervised release was still running in May of 2011. The government had to prove both periods of supervised release tolling in order for the Court to retain jurisdiction. The government proffers a lot of disputed and unresolved facts with regard to the second period of tolling, but this Court need not reach that second period because the government did not prove that the first period tolled. And the facts with regard to that first period are quite different. Just to get clear on the standards we have here, the government's burden in the District Court is to prove it by preponderance of the evidence? Yes, Your Honor. And then on appeal, how do we review the District Court's decision? De novo. De novo. Well, isn't that disputed? I mean, because don't we have to defer to the facts? Well, in Watson, this Court reviewed de novo when there were factual issues in dispute. The Court held in Watson that de novo review applied to the question of whether there was any inference in the record that the federal government was aware that Mr. Watson was in custody, and this Court reviewed de novo. But even if this Court were to defer to Judge Liu's finding, Mr. Williams would prevail. So I guess you do need to resolve that. I would submit that it's de novo. These are legal questions. The facts are basically undisputed in this case. It's not disputed that Mr. Williams reported to his probation officer in November of 1999 and advised that he would be returning to his native Belize. It is not disputed that he actually did return to his native Belize. As a matter of law, when a deportable alien returns to his home country, supervised release does not toll. It runs. And there is no evidence in the record that Mr. Williams was back in the United States before May 27th of 2001. So therefore, even if we were to defer to the factual findings, the factual issues are basically not in dispute. What's in dispute is this allegation that the government makes that Mr. Williams did not actually self-deport. But that's not really a fact. That's sort of a – that's basically post hoc reconstruction, because it doesn't matter whether he left the country intending at some time to return. Regardless, that is irrelevant to the question of whether or not he was deported. It was a dispute over whether he actually left the country? There isn't any dispute that he actually left the country. The court finds that he left the country in November of 1999. The government does not argue that he did not leave the country in 1999. There is actually no dispute as to whether he left the country. But isn't the dispute when he came back? The dispute is when he came back. But the only evidence in the record is that he came back on May 27th of 2001. There is not one – Is that the Michigan signing? Okay. There's not one piece of evidence indicating that he was in the country before that. Rather, all of the evidence indicates that he was in Belize. But the evidence, I guess, I mean, the district judge below or tell me if this is correct, certainly the probation officer thought the evidence was sketchy or questionable with respect to what was happening with your client and whether or not he initially actually went to Belize and if he was there, for how long he stayed, because the documents were not clear. The documents were not clear. But in terms of it being sketchy, it does seem that Mr. Crovella was – And I'm using that term to best describe what I'm trying to capture with the probation officers who had, I guess, a longstanding relationship with your client or at least had been supervising him for some time, what his impression was. I'm trying to capture his. Yes, that's true. But the probation officer's allegations are equally sketchy. The probation officer did not state at any point until cross-examined that he did, in fact, receive a letter from Mr. Williams's attorney in November of 1999 indicating that Mr. Williams had returned to Belize. There's no – he never mentioned that to anyone, and yet it's in the record. It was in his file, a letter from Mr. Neal, Mr. Williams's attorney, in November of 1999 that contained the I-392. Yes, there was an error on the I-392 that said 611 instead of 116. But there's no dispute that Mr. Williams did return to Belize and that his lawyer did send this letter. The probation officer didn't even call the lawyer. He did nothing with that. He just assumed, oh, because it says June 11th, Mr. Williams must have previously gone to Belize in June of 11 and then snuck back. But that makes no sense whatsoever. If Mr. Williams's intention of going to Belize was to throw off his probation officer, if he could have managed to do that in June, in June, he would have done it in June. There's no evidence whatsoever that he was in Belize in June. But isn't there some, you know, evidence that your client was supposedly in Belize and all of a sudden he's in Michigan. Your client is in Belize, all of a sudden he's in the airport in Long Beach or L.A. I mean, isn't there some of those instances that would cause somebody some doubt and try to figure out what happened? Yes, and he didn't try to figure out what happened. This is what, this is a case. Didn't they have a hearing? I mean, wasn't that the whole purpose of the hearing and for the judge to decide these facts? In 2001, let's be clear, in 2001 when he was found in Michigan, he was brought in for a hearing and the government chose to dismiss the absconding charge. The government chose to dismiss the charge at the very time when all the witnesses would have been available to testify. They did not hold that he was an absconder in 1999. They didn't even allege that his supervised release had told during that period. They just placed him back on supervised release. So for the government to argue in 2012 that he was an absconder in 1999 when they had the opportunity in 2001 when all the witnesses were still available is highly problematic. None of the witnesses were available in 2002. The attorney was dead. Mr. Williams' parents were dead. His wife was dead. His father-in-law and mother-in-law were all dead. So the fact that I'm just trying to figure this out just in terms of what happened. But you're arguing the fact that he was given a break at that point in time. That can be used against him now. He was not given a break in that point in time. As you said, they could have gone after him, but they decided to give him another opportunity to report. At that time, he would have had the opportunity to prove that he had been in the lease. Let's look at the record, okay? In 1999, he told his probation officer he was returning to the lease, okay? In November of 1999, both the probation office and the INS received a letter from an attorney in the lease indicating that he had returned to the lease. Provella did not believe that, so he went to Mr. Williams' home. Mr. Williams was not at his home. His wife was at the home, and she said, My husband is in the lease. Mr. Provella did not at that point ask, Do you have an address for him in the lease? Mr. Provella issued a warrant. At that point, Mr. Williams learned that there was discrepancy and saw that the I-392 was incorrect. He and his lawyer went back to the embassy, had a corrected I-392 prepared, sent that one both to the INS and to the probation office. At that point, Mr. Provella wrote a letter to the embassy saying, I'm confused. The embassy wrote a letter back saying, Yes, Mr. Williams has been in the lease. What more was Mr. Williams to do to demonstrate that he was, in fact, in the lease? There was no evidence that he was in the United States before May of 2001. Let me ask you a question about that. After Provella goes and visits the wife and doesn't find the defendant there, ostensibly the defendant is in the lease, right? Yes. What power does the probation officer have over somebody who was not within the jurisdiction of the United States to tell them to return to the United States and report to his office? Is there any power? There isn't any really power over that, but what we do know is that supervised release actually runs while an alien is outside the country. It doesn't run. It does run. But all that runs is the time, isn't it? I mean, if I deport somebody to Mexico or Belize or whatever, the probation office, if they return to the United States, can supervise them. But do they have any power to tell them what to do? I mean, they could be in Belize using drugs or doing anything else. Is that a violation of their supervised release? I don't know that it would be a violation of the supervised release, but it's possibly a violation of the supervised release because the 3583 statute specifically has things that someone is supposed to do while they're out of the country, and one of them is to not return to the country. But in any event, we know that regardless of whether he self-deported, was deported by the government, or voluntarily returned to Belize, he continued to be on supervision and his time continued to run. All we have is the probation officer's suspicion that he was not in Belize. But all the evidence indicates that he was, in fact, in Belize. There's not one shred of evidence that he wasn't in Belize. Looking to the fact that he's possibly in Long Beach in September of 2003, that doesn't indicate that he was in Long Beach between 1999 and 2001. And it doesn't indicate that he wasn't. And so isn't that a fact that the judge has to determine on where he was during these time periods? The judge never determined that he wasn't in Belize. Well, the judge had to determine when this should start, I mean, whether or not he violated the terms of his supervision. Right. And the judge – I'm sorry. And I'm just trying to figure out whether there was a sufficient basis, based on all the jumping around in terms of, you know, your client gone and all of a sudden he reappears. He's supposed to be in Belize, but he's not in Belize. And, you know, I doubt that the first day he got back from Belize, but maybe it's possible, that certainly opens a question of whether or not the first day he got back from Belize, he was arrested, you know, in Michigan. The first day that he got back after being in Belize, he's found in the Long Beach or L.A. airport. So it just seems like there's open question here, and someone needs to decide, and it looks like the district court decided, whether or not, you know, he was back or not. And I just want to know if that's a sufficient basis. I think I know the answer from you. I don't believe it's a sufficient basis, because if you look at the cases, Ignacio Juarez, the day that they return is the day that they're found in the United States. For the court to credit a probation officer's suspicion that is based actually on nothing, the suspicion is based on nothing. The probation officer suspected that Mr. Williams had not actually deported, because the finding of the district court was that he never sent the documentation that was required from the embassy. That is simply not true. Counsel, we're well over now, and if we want to give you two minutes for rebuttal, we'd better move on. Good morning, Your Honors, and may it please the Court. Ronnie Katzenstein for the United States. I'd like to begin by following up on something that Judge Munguia said, which is to look at this from the point of view of the probation officer. What the probation officer had was a supervisee who told him he was going to Belize, and then the probation officer said, give me proof. You must send me proof that you went to Belize. That instruction points to the distinction in this case with all the other cases that are cited by defendant, which is in this case the defendant was taking himself out of the country voluntarily. He was not being deported by an agency of the United States. And so by definition, the probation officer had to rely on the supervisee to provide him with the proof that he had left the country. Because the probation officer's obligation to supervise includes administering his file while the supervisee is out of the country. Well, that's an interesting point. But what would Mr. Williams have had to send from Belize to adequately prove to the probation officer that he was actually there? Because it looks like he did provide a lot of different, I mean, like three different things, including talking to an official from Belize at one point in time who sent him something. What did he need to send? Yes, Your Honor. Well, there is no evidence that he spoke with somebody in Belize. What the probation officer received, what we have that the probation officer received was a letter in November of 1999 which included as the proof of the deportation of that Mr. Williams had gone to Belize. The proof was a reference solely to the fact that Mr. Williams had left in June of 1999. And I would point the Court to what was submitted at page 9 of the defendant's own request for judicial notice. That is what was submitted to the probation officer with the letter, the November 10, 1999 letter, which is at 177 of the ER. Well, let's go in order, because I think there were three different things, if I recall correctly. Yes. An attorney sent a form or a letter to the probation officer indicating that Mr. Williams appeared at the U.S. Embassy on June 11, 1999. Is that correct? That's right. No. Yes. That is, as I said, that's at exhibit, that's at ER 177 and request for judicial notice, page 9. So that is the document. That is all the probation officer had until 2000. So for at least over a year, all he had from Mr. Williams was a reference to his departure in June of 1999, and as the probation officer said, told the Court, he knew that that wasn't establishing that he'd left in November of 1999 because the probation the defendant was back seeing him in July of 1999. Now, you are correct, of course, Your Honor, that then in December of 2000, another letter came, and that letter had the same form referring to June of 1999 with an annotation on it saying, no, although it says June of 1999, in fact, what's being referred to is November of 1999. And that is at page 107 of the government's, of the excerptive record. But that was also ambiguous because it was attached to a, it referred, the annotation referred to a stamp on the birth paper. That birth paper is at 108 and 109 of the excerptive record, and that stamp refers to a completely different date, July 15th, 1999. So the probation officer said he had no information. It was all ambiguous to him. And in any case, I know that defense counsel has. And then he received, though, a letter from the embassy. Let's talk about that. Yes. Because it looked like that's his best shot there. If you don't take anything into account from the other two letters that were from lawyers, from the same lawyer, I guess, with the problem dates. But he received a letter from the actual embassy. Why was that not sufficient? Well, the parties have agreed that the date on that letter is actually 2001, not 2000. Which letter? Just when you sent that letter. The letter from the embassy. That's the letter from Janice Savory, which is, just to be clear, it's page 179 of the excerptive record. And the parties have agreed that that is actually, there's a typo in the letter, that the date is actually 2001. Even the embassy got dates confused. I'm sorry? Even the embassy got dates confused. Well, I think it's not uncommon for people in January to put the earlier year. But in any case, the parties have agreed that it was 2001. And even if you say that that is sufficient to establish that at some point he was in Belize because all the letter says is that Mr. Williams was in contact with the embassy in Belize. And we know he was in contact in June of 1999. Well, to the embassy from the letter, which is, you say, in January 2001, the embassy says Mr. Williams is indeed in Belize. I'm trying to figure out why the probation officer discounted the probative value of that letter. Well, he discounted the probative value of that letter to establish that Mr. Williams had actually been in abroad all the time and that he had left when he said he left because it didn't include the documentation that it said it was going to include. It only included a photograph. It didn't include all the other items that it said were going to be included with it. But even if he has now established – even if that should have been satisfactory evidence, it's in 2001. Mr. Williams is still – he has been a fugitive for at least a year, and that would be sufficient to put him still on supervision at the time of the revocation here. So the probation officer said to him, you have my permission to go to Belize. That was in 1999. Yes. He said – And then you have the embassy saying in January 2001, he's here. Is there any evidence that he wasn't there in the interim period? There is – the probation officer said, go, but you must send me proof that you have And as we know from a case cited by defense counsel, Osa Gallegos, he did not comply with that. So from the probation officer's point of view, he is a fugitive for that period, and we know the probation officer is looking for him, desperately looking for him.  But from a factual standpoint, not what the probation officer thought, but is it the government's burden to prove he was in the country, or is it his burden to prove he was out of the country? I think it's the government's burden to prove that he is out of compliance with his obligations under supervision in such a way that the probation officer is unable to supervise him and administer the file properly. And that is what happened here. He was out of compliance because he was instructed to provide proof that he was in Belize, and he did not do so. Well, let me ask you a question. If, in fact, he – the facts are that he was out of the country, then would you agree that he can no longer be under supervised release and the revocation was inappropriate? No, Your Honor. I wouldn't, because he has – the fact that he is out of the country and there's a deportation order, that is enough to say, all right, supervision keeps running. But by virtue of the fact that supervision keeps running, he is obligated to also comply with other provisions. And one of those provisions was to provide proof, which he didn't do. And if I could just take a moment to touch on the question of the standard of review, which was an issue earlier. I know counsel has relied on the Watson case to say that this should be de novo review. I disagree with that respectfully, and I would say in Watson, you know, the allegation was that the defendant had moved from the location of his supervision to Minnesota without permission and had failed to report. In the district court, he claimed that he had permission, that he was not a fugitive at all, and then on appeal, he acknowledged that he was a fugitive, but the issue on appeal was what time, when that period of fugitive absconsion had ended. And the court looked at that for the first time, which was why it was a mixed question. Here in the district court, analogously, originally there was an issue that arose with respect to the warrant. It came up on appeal. The court found, no, there may have been fugitive tolling and sent it back to the district court for factual findings. There were factual, specific factual findings done here. There was an evidentiary hearing. The witness, the probation officer, testified. His credibility was there. He was available to be cross-examined and challenged. It was a judge who made factual findings based on a lengthy record and experience with this defendant over many years. I would suggest in those circumstances, clearly erroneous standard under Baclan, which says factual findings in support of jurisdiction are subject to clearly erroneous review. Kagan, you said the district court made factual findings. He didn't really go through and make factual findings with respect to this, did he? He did find that the Mr. Williams had not provided proof that was satisfactory to the probation officer. And further, he made factual findings that what was sent to the probation officer was designed to delude the probation officer and basically put him off the scent. And those factual findings were also fully supported by the record by virtue of the fact the timing when he left, the order of deportation had been in place for four months, had been final for four months. Mr. Williams didn't leave until a day after one of his associates had been arrested. It was also the case that when Mr. Williams came back, was found in the United States in 2001 and asked by the probation officer, where were you? What have you been doing? Mr. Williams refused to respond to that question. I think that also goes to the issue. I'm sorry. I probably am well over. I'm well over. And we're coming off on a new time tangent. Thank you. Let me ask you one practical question. Is it correct that he only has two more months to serve on this? According to the BOP website, his release date is June 28th, Your Honor. And then he will be deported then instead of a month or so earlier? My understanding is he is a deportable alien, and then I would assume that he would go into deportation. Are there any practical differences other than the fact that he'll be deported a month or so earlier? The practical difference is to as a practical matter, if the lower court is not affirmed, then as a practical matter, what will happen is he would be going to deportation proceeding slightly earlier, as Your Honor has mentioned. And the period of supervised release which was imposed, he has in addition to his custodial term, in this case, additional supervised release of 63 months. That would evaporate. But as a practical matter, it wouldn't make a difference because he's going to be deported. There's no other outstanding warrants from California? To be honest with you, Your Honor, I haven't checked that. Thank you. Thank you. Your Honor, I have three points. First, I need to make clear that being in violation of supervised release does not toll supervision. What tolls supervision is being a fugitive. And so even if the district court were correct in finding that he violated supervised release by not providing proper documentation, that would not make him a fugitive. That's clear because under 3583I would be totally irrelevant if simply violating supervised release rendered you a fugitive. So that's number one. Number two, even if this is a clearly erroneous standard, the district court's findings are clearly erroneous. On paragraph 8, which is at 4, and this is crucial to the government's argument, the court found that the defendant did not follow the directions of his probation officer and failed to provide adequate information to the probation officer confirming defendant's arrival in Belize. The probation officer advised Mr. Williams to go to the embassy and send proof from the embassy. That's exactly what he did. He went to the embassy and he sent proof from the embassy. He did not realize that the embassy had made a mistake on the form. When he realized that the embassy had made a mistake on the form because Mr. Provella had gone to his wife's house in Inglewood, he went back to the embassy, had the error corrected, and sent the form again. The probation officer still wasn't satisfied, so he wrote a letter to the embassy, and that's not in this record, but it's in the record. He doesn't ask for proof of what day Mr. Williams arrived. All he asked for is proof that Mr. Williams is in Belize, and that is what the embassy provided. The government argues that because that came in 2001, that rendered Mr. Williams a fugitive for two years. Mr. Williams was not a fugitive for two years because the embassy made a mistake on the paperwork. Mr. Williams told his probation officer he was returning to Belize. He went to Belize. He had paperwork sent from the embassy. There was a mistake. If that mistake was corrected in 2001, that goes back to the original time that he left. It's not as if he was a fugitive until the embassy corrected the paperwork. And I think most importantly, there was absolutely no evidence that Mr. Williams was in the country before May 27, 2001. The cases are clear. Ignacio Juarez, Murillo Olivares, when you are found in the country, that is the day you are back in the country. Surmises or suspicions that you might have been in the country earlier are not sufficient. Mistakes on the form are not evidence that he was back in the country earlier. The government spends a lot of time talking about the birth paper. There's not one shred of evidence in this case that the birth paper that the government points to is even the birth paper that is relevant in this case. We have no idea where that birth paper came from. What was this defendant to do? He self-deported while he was under a final order of deportation. The fact that he got delays, and again, it's in the A file. It's very clear that the government knows he got permission to delay his deportation. He deported. He told his probation officer he was deporting. He went to the embassy. He had the record sent by an attorney. The probation officer did not even call that attorney to find out what was about the error. In fact, the probation officer claimed that he received no evidence. He received no evidence. So the probation officer was not credible. And Judge Liu's findings were clearly erroneous. Thank you. The case is adjourned. You will be submitted.
judges: Molloy, Reinhardt, Murguia